# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

ON REMAND

NO. 03-17-00666-CV

**Facility Insurance Corporation, Appellant**

v.

**Patients Medical Center, Appellee**

FROM THE 200TH DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-13-003388, THE HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

M E M O R A N D U M   O P I N I O N

This appeal concerns a medical fee dispute under the Texas Workers'
Compensation Act (TWCA), *see generally* Tex. Lab. Code §§ 401.001–419.007, between the
insurance carrier Facility Insurance Corporation (the Carrier) and the provider Patients Medical
Center (the Provider) for medical services the Provider provided to an injured worker (the
Claimant). After the Provider initiated the process for medical fee dispute resolution (MFDR),
an MFDR officer with the Texas Department of Insurance, Division of Workers' Compensation
(the Division) adjudicated the dispute and awarded the Provider $20,495.78 in additional
reimbursement. The Carrier requested a contested case hearing before the State Office of
Administrative Hearings (SOAH). After the SOAH hearing, the administrative law judge (the

ALJ) signed a Decision and Order (the SOAH Order) concluding that the Carrier "failed to carry its burden that Provider is not entitled to $20,495.78" in additional reimbursement.

The Carrier sought judicial review, raising multiple issues. The district court affirmed the SOAH Order, and the Carrier appealed to this Court. We reversed on a single issue—determining that the ALJ improperly shifted the burden of proof from the Provider to the Carrier in the contested case hearing before SOAH—and remanded the case to the Division for further proceedings. *See Facility Ins. Corp. v. Patients Med. Ctr.*, 574 S.W.3d 436, 444 (Tex. App.—Austin 2018), *rev'd and remanded*, 623 S.W.3d 336 (Tex. 2021). But the Texas Supreme Court reversed our ruling, holding that "in a worker's compensation proceeding, the burden of proof in a contested case hearing before SOAH is on the party seeking review of the Division's initial MFDR decision." *Patients Med. Ctr. v. Facility Ins. Corp.*, 623 S.W.3d 336, 343 (Tex. 2021); *see also id.* at 338 n.2, 341 (noting that rules authorized party to "seek review of the [MFDR] decision" by requesting contested case hearing and that burden of proof is on "'the party seeking relief'" (quoting 28 Tex. Admin. Code §§ 133.307(f) (MDR of Fee Disputes), 148.14(b) (Burden of Proof))).[1] The Texas Supreme Court remanded the case to this Court to consider the Carrier's other appellate issues that we did not initially reach:

> (1) whether the ALJ erred in failing to apply a contractual fee rate; (2) whether [the Provider] failed to submit a timely, complete medical bill; (3) whether [the Provider] waived its entitlement to MFDR by failing to request reconsideration of [the Carrier]'s denial of the "corrected bill"; and (4) whether the ALJ incorrectly determined [the Provider]'s entitlement to and the amount of reimbursement.

*Id.* at 340 n.6, 343.

---

[1] We cite to the versions of Division rules that were in effect during the time frame relevant to the underlying MFDR proceeding. All citations to Title 28 of the Texas Administrative Code are to rules promulgated by the Texas Department of Insurance.

On remand, although we overrule the first three issues, *see Texas Comm'n on Env'tl Quality v. Maverick County*, 642 S.W.3d 537, 550 (Tex. 2022) (noting that appellate court could reach issues "not strictly necessary to each court's disposition of the case" and "particularly in a complex administrative appeal"), we reverse the SOAH Order in part based on the Carrier's fourth issue and remand the case to the Division for further proceedings consistent with this opinion, *see* Tex. Gov't Code § 2001.174(2); *Freightliner Corp. v. Motor Vehicle Bd. of Tex. Dep't of Transp.*, 255 S.W.3d 356, 366 (Tex. App.—Austin 2008, pet. denied) ("Courts are legislatively empowered to limit the scope of a remand to the part of an order that contains error."). We affirm the SOAH Order in all other respects. *See* Tex. Gov't Code § 2001.174(1).

## BACKGROUND

The Texas Supreme Court has provided an overview of the legal framework for MFDR proceedings, *see Patients Med. Ctr.*, 623 S.W.3d at 338; *see also Vista Med. Ctr. Hosp. v. Texas Mut. Ins.*, 416 S.W.3d 11, 15–18 (Tex. App.—Austin 2013, no pet.), and both our initial opinion and the Texas Supreme Court's opinion in this appeal provide the procedural and factual background of this case, *see Patients Med. Ctr.*, 623 S.W.3d at 338–40; *Facility Ins.*, 574 S.W.3d at 439–41. Accordingly, we limit our background discussion here to what is necessary to resolve this appeal and refer readers to those opinions for additional factual and legal background.

On August 19, 2009, Dr. Chris Fuke with the Provider submitted a Pre-authorization Request/Procedure Order to perform two procedures on the Claimant: "Spinal cord stimulator-revision" and "Programming," coded as Current Procedural Terminology (CPT)

63660 and 95972, respectively.[2]    The request also stated, "Please consider the following procedures for pre-authorization.    I am also faxing[.]    See attached documentation . . . ." (Ellipsis in original.)    The appellate record, however, does not include any "attached documentation" to the preauthorization request.

On September 22, the Carrier's agent UniMed Direct faxed the Provider an August 24 report by Dr. Lisa Gill that recommended approving the request.[3]    Dr. Gill was an "anesthesiologist reviewer," and "one of [UniMed Direct's] physician advisers, who—who renders the decision on these approvals."    In the report, Dr. Gill described the Claimant's "history of condition" as "hav[ing] an spinal cord stimulator (SCS) in that worked well but the leads were removed in 10/08 due to migration" and noted that "[t]he MD is requesting replacement of the leads."    In the report's conclusion, Dr. Gill explained:  "The [Claimant] had good relief with her last SCS and poor relief (pain 10/10) now that it is out.  The leads had moved so were pulled.  The generator remains.  The MD wants to replace the leads, hook them back up, and reprogram the unit to get maximum coverage.  This is a very reasonable tx plan."

On September 23, Dr. Fuke performed surgery on the Claimant and signed the Operative Note describing the procedure.    The Operative Note lists three procedures performed—"Spinal cord stimulator lead and generator revision," "Fluoroscopic guidance for the

---

[2]  In the American Medical Association's Current Procedural Terminology (2004), which was included in the record, CPT 63660 is described as "Revision or removal of spinal neurostimulator electrode percutaneous array(s) or plate/paddle(s)" and CPT 95972 is described as "complex brain, spinal cord, or peripheral (except cranial nerve) neurostimulator pulse generator/transmitter, with intraoperative or subsequent programming, first hour."

[3]  UniMed Direct is "the bill review company who processes the bills" for "the third-party administrator for [the Carrier]."    At the SOAH hearing, UniMed Direct's employee Ian Bladuell testified that the report is "summarizing what the physician wants to do" and is the reviewing doctor's "conclusion after reviewing what's submitted for preauthorization."

above procedure," and "Epidural blood patch"—and narratively describes the placement, adjustment, and anchoring of leads and the dissection and placement of the generator.

On September 30, the Provider sent a medical bill to UniMed Direct, listing nineteen items that totaled $94,640.48. In November, UniMed Direct sent the Provider a check for $2,354.75 with an explanation of benefits (the 2010 EOB) that denied most of the billed items. The only item that was not denied was for "revise/remove neuroelectrode" code 63660, but UniMed reduced the amount from $2,558.75 to $2,354.05, stating as the reason: "A2-contractual adjustment any reduction is in in accordance with the Focus/AETNA Worker's Comp Access LLC contract. For questions regarding reductions please call 1-800-238-8288." (Capitalization removed.) The reasons listed next to the denied items were either "workers compensation state fee schedule adjustment. Fee guideline MAR reduction" or "payment denied/reduced for exceeded precertification/authorization." (Capitalization removed.)

On March 11, 2010, the Provider sent UniMed Direct the original bill with "1st Request for Reconsideration–Not Duplicate" handwritten on it and accompanying documentation, including the Operative Note. In a cover letter, the Provider explained:

> Our facility is requesting for the above claim to be reviewed and reconsidered. We have received a small payment of $2,354.75; being informed that 2 of the procedures performed were denied, as well as all the implants. I have obtained a copy of all of the invoices for implants and ask that you review those. According to our vendor the implants were used for **Revision/removal of NeuroElectroders** therefore at least some of our implants should have been considered and not denied in its entirety.

5

On March 25, UniMed Direct responded with an explanation of review, reasserting its original payment decision and again listing itemized reasons for denial of payment.[4]

On April 19, the Provider sent a "2nd level of Reconsideration" to UniMed Direct. Across the bill was handwritten "2nd Level of Appeal" and under the remarks section of the bill was handwritten "Corrected Bill." The cover letter states:

> Our facility received our 1st level response from our appeal, we are now submitting the 2nd level, after reviewing the billed charges it was determined that line charges for CPT Code 360 were billed incorrectly. On this corrected bill you will find that there are (3) line items for this Rev Code; we understand that only one procedure was allowed CPT code 63660 since our Aetna Network was used on re pricing this claim, the allowed amount of the corrected charges are:
>
> CPT Code:63660
> $3,411.68 @ 92% =$3,138.75 less the amount previously paid $2,354.75 leaving a balance of $784.00 in which we are seeking reimbursement for.

The attached "Corrected Bill" increased the "Total Charges" for each of three items—"revise/remove neuroelect 63660," "revise/remove neurorecei 63688," and "treat epidural spine les 62273"—from the $2,558.75 listed on the original bill to $3,411.68 and omitted a fourth item—"analyze neurostim, compl 95972"—from the original bill. (Capitalization removed.) On the line for "revise/remove neuroelect 63660"—the only item the Carrier paid after receiving the original bill—was handwritten "@92% $3,138.75." Finally, the bill code "0131" on the "Corrected Bill" was crossed out and "137" and "CORRECTED" were handwritten instead. On April 30, UniMed Direct sent the Provider another explanation of review, reasserting its original

---

[4] These reasons included: "Payment denied/reduced for exceeded precertification/authorization. UMD recommends $0.00"; "Payment is included in the allowance for another service/procedure. Included in global reimbursement. UMD recommends $0.00"; "Original audit decision is being maintained. Upon review, it was determined that this treatment was processed properly. $0.00"; and "Reconsideration no additional payment. Original payment decision is being maintained. Upon review, it was determined that this claim was processed properly." (Capitalization removed.)

payment decision and raising the additional explanation code "29 The time limit for filing has expired. $0.00." The Provider did not request reconsideration of the "Corrected Bill."

On September 22, 2010, the Provider requested MFDR and asserted that the Carrier owes a remaining $92,285.73, as reflected on the original bill. On November 3, the Division sent the Carrier a fax requesting additional information, including "[a] copy of the contract between the informal/voluntary network and [the Provider]" and "[d]ocumentation to support that [the Provider] was notified in accordance with 28 Tex. Admin. Code § 133.4." On November 19, Aetna Worker's Comp Access submitted to the Division a March 14, 2008 Hospital Services Agreement (the Aetna Contract) between the Provider and Aetna Health, Inc. In the cover letter to the Division, Aetna's representative stated, "In response to the [Division]'s inquiry regarding compliance with 28 Tex. Admin. Code 133.4, [the Provider] has been made aware of their participation status with [Aetna Worker's Comp Access] since April 15, 2008."

On March 13, 2013, the MFDR officer signed her findings and decisions. As to the Aetna Contract, the MFDR officer found:

> Review of the submitted information found insufficient documentation to support that the disputed services were subject to a contractual fee arrangement between the parties to this dispute. Nevertheless, on November 3, 2010, the Division requested the respondent to provide a copy of the referenced contract as well as documentation to support notification to the healthcare provider, as required by 28 Texas Administrative Code § 133.4, that the healthcare provider had been given access to the contracted fee arrangement. Review of the submitted information finds that the documentation does not support notification to the healthcare provider in the time and manner required. The Division concludes that, pursuant to § 133.4(g), the insurance carrier is not entitled to pay the health care provider at a contracted fee.

The MFDR officer also made findings that some of the Carrier's reasons for denial were supported as to some items but not others and made various adjustments, reducing the amount due from $92,285.73 to $20,495.78.

The Provider did not contest the $20,495.78 amount, but on April 2, the Carrier requested a contested case hearing before SOAH. At the SOAH hearing, the documents described above were admitted into evidence and Paul Hanson, the Provider's chief financial officer, and Ian Bladuell, an employee with UniMed Direct, testified as witnesses. On August 28, the ALJ signed the SOAH Order. Among other findings and conclusions, the ALJ found that "[t]he initial bill, with all fields completed, was received by Carrier within 95 days from the date of service but contained a procedure coding error" and concluded that it "was a complete medical bill as defined by 28 Texas Administrative Code § 133.2" and that "Carrier failed to carry its burden that [the Provider] is not entitled to $20,495.78 in additional reimbursement." The Carrier sought judicial review of the SOAH Order, and the district court affirmed.

**DISCUSSION**

On remand, the Carrier reasserts its four appellate issues challenging the SOAH Order that were not addressed in our initial opinion and in the Texas Supreme Court opinion. Our review of the SOAH Order is governed by the "substantial evidence rule." *See* Tex. Gov't Code § 2001.174; Tex. Lab. Code § 410.255(b). Under that standard, we must reverse or remand the case for further proceedings "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are" "in violation of a constitutional or statutory provision," "in excess of the agency's statutory authority," "made

8

through unlawful procedure," "affected by other error of law," "not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole," or "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Tex. Gov't Code § 2001.174(2). When applying the substantial evidence rule, "a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion." *Id.* § 2001.174. "The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency." *Maverick County*, 642 S.W.3d at 544 (quoting *Texas Health Facilities Comm'n v. Charter Med.–Dall., Inc.*, 665 S.W.2d 446, 452 (Tex. 1984)).

**Complete Medical Bill**

We begin with the Carrier's second appellate issue. The Carrier argues that the Provider's September 2009 bill, which was the subject of the SOAH Order, did not qualify as a "complete medical bill" because it had an incorrect service code. Thus, according to the Carrier, the Provider forfeited the right to reimbursement on that claim because it did not submit a "complete medical bill"—i.e., the "Corrected Bill"—until after the 95-day deadline. *See* Tex. Lab. Code § 408.027(a) (providing that provider's failure to timely submit claim for payment within 95 days after date of health care services constitutes forfeiture of provider's right to reimbursement). The Division rules define "[c]omplete medical bill" as:

> A medical bill that contains all required fields as set forth in the billing instructions for the appropriate form specified in § 133.10 of this chapter (relating to Required Billing Forms/Formats), or as specified for electronic medical bills in § 133.500 of this chapter (relating to Electronic Formats for Electronic Medical Bill Processing.

28 Tex. Admin. Code § 133.2(2) (Definitions). In the SOAH Order, the ALJ made the following relevant findings of fact and conclusion of law: "The initial bill, with all fields completed, was received by Carrier within 95 days from the date of service but contained a procedure coding error"; "The initial bill was complete"; and "The medical bill Provider sent on September 30, 2009, was a complete medical bill as defined by 28 Texas Administrative Code § 133.2."

In challenging the SOAH Order on appeal, the Carrier does not argue that any "required fields" in the Provider's medical bill were left blank. Instead, the Carrier limits its challenge to arguing that "[a] bill with incorrect coding or charge amounts is not complete" because the Division's Medical Contested Case Hearing Decision Manual-Medical Fee Disputes (Decision Manual) "states that to be entitled to payment, a medical bill with even one coding error is not a complete bill, and must be corrected within the 95-day deadline." (Capitalization removed.) In the SOAH proceeding, the Carrier submitted excerpts from the Decision Manual as an exhibit, which state, as relevant here:

**Complete Bill Required**
The bill must be complete, with any corrections submitted during the 95-day period. M4-08-3413-01. There is no provision allowing for the resubmission of an incomplete or improperly submitted bill after the 95-day period. M4-09-1662-01. HCP shall include correct billing codes from the applicable Division fee guidelines in effect on the date or dates of service when submitting medical bills. See Rule 133.20(c).

**Incomplete Bill – Incorrectly Coded**
MFDR found that HCP did not submit a timely request for reimbursement to IC. Although the first bill for $68.25 was submitted within 95 days from the date of service, it was incorrectly coded. Approximately six months after the date of service, HCP submitted a corrected bill which was properly coded. IC denied the bill, citing § 408.027, and the fact that the corrected bill was not submitted within 95 days. HO affirmed the decision of MFDR that HCP failed to timely request reimbursement pursuant to § 408.027.

10

<u>M4-08-3413-01</u>.

The Carrier asserts that the decisions in the Decision Manual "are the agency's expression of its interpretation and application of its rules, which the ALJ was bound to follow and to which the courts are bound to defer."[5]

We need not decide, however, whether the September 2009 original bill constituted a "complete medical bill," notwithstanding any coding errors. Even if the ALJ erred in concluding that the original bill was complete, the conclusion would not have prejudiced the Carrier's substantial rights as explained below, and therefore we are not authorized to reverse or remand the ALJ's decision on this ground. *See* Tex. Gov't Code § 2001.174(2).

A provider's delivery of a "complete medical bill" triggers a carrier's obligation to take final action within a certain time period. *See* 28 Tex. Admin. Code § 133.240(a) (Medical Payments and Denials) ("An insurance carrier shall take final action after conducting bill review on a complete medical bill, or determine to audit the medical bill . . . not later than the 45th day after the date the insurance carrier received a complete medical bill."). But here it is undisputed that the Carrier took final action on the September 2009 bill and on the March 2010 request for reconsideration by making a $2,354.75 payment and denying the rest of the charges. *See id.* §§ 133.2(4) ("Final action *on a medical bill*—(A) sending a payment that makes the total reimbursement for that bill a fair and reasonable reimbursement . . . and/or (B) denying a charge on the medical bill." (emphasis added)), .250(f) (Reconsideration for Payment of Medical Bills) ("The insurance carrier shall take final action on a reconsideration request within 21 days of receiving the request for reconsideration. The insurance carrier shall provide an explanation of

---

[5] The Carrier relies entirely on these excerpts and does not rely upon statutory or rule language to argue that the Provider's bill was not a "complete medical bill."

11

benefits for all items included in a reconsideration request in the form and format prescribed by the Division."). And it is the Carrier's "final action" on a medical bill, regardless of whether the bill is a "complete medical bill," that triggers the Provider's right to request reconsideration and MFDR. *See id.* §§ 133.240(h) ("If dissatisfied with the insurance carrier's final action, the health care provider may request reconsideration of the bill . . . ."), (i) ("If dissatisfied with the reconsideration outcome, the health care provider may request medical dispute resolution . . . ."), .250(a) ("If the health care provider is dissatisfied with the insurance carrier's *final action on a medical bill,* the health care provider may request that the insurance carrier reconsider its action." (emphasis added)), (h) ("If the health care provider is dissatisfied with the insurance carrier's *final action on a medical bill* after reconsideration, the health care provider may request medical dispute resolution in accordance with § 133.305 . . . ." (emphasis added)), .305(a)(3)(A), (4)(A) (MDR—General) (defining "Medical dispute resolution" to include "process for resolution of" "a medical fee dispute" and defining "Medical fee dispute" to include "a health care provider (provider) . . . dispute of an insurance carrier (carrier) reduction or denial of *a medical bill*" (emphasis added)).[6]

If the medical bill is not complete, the Division's rules provide a mechanism by which the Carrier may satisfy its obligations without taking final action. *See id.* § 133.200(a), (c)

---

[6] At the time of the Provider's billing of the Carrier for the provided health care services, Chapter 133 of Title 28 of the Texas Administrative Code contained multiple references to a medical bill being complete or incomplete. *See* 28 Tex. Admin. Code §§ 133.2(2) (Definitions), .20(f), (g) (Medical Bill Submission by Health Care Provider), .200(a), (c) (Insurance Carrier Receipt of Medical Bills from Health Care Providers), .230(b)(1), (4) (Insurance Carrier Audit of a Medical Bill), .240(a), (j), (k) (Medical Payments and Denials), .250(e) (Reconsideration for Payment of Medical Bills), .501(b)(2), (3), (c)(3), (4) (Electronic Medical Bill Processing). These references primarily concerned the triggering of deadline obligations to provide notice or final action, and none bestow rights such that the ALJ's conclusion that the bill was complete would have prejudiced the Carrier's substantial rights were it erroneous.

(Insurance Carrier Receipt of Medical Bills from Health Care Providers) (requiring carriers to take certain action upon receipt of "a medical bill that is not complete as defined in § 133.2" and providing that "[t]he proper return of an incomplete medical bill in accordance with this section fulfills the insurance carrier's obligations with regard to the incomplete bill"). Here, however, the Carrier admits that it did not follow Rule 133.200 regarding the proper response to an incomplete medical bill and instead took final action on receiving the original medical bill.[7]

In sum, a provider has the right under the relevant rules to seek reconsideration and MFDR when it is dissatisfied with a carrier's "final action on a medical bill." And the rules do not require that the medical bill be complete for a carrier to take "final action" on the medical bill. Because it is undisputed that (1) the Carrier took final action on both the September 2009 medical bill and the March 2010 request for reconsideration, (2) the Provider requested MFDR based on dissatisfaction with the Carrier's final actions, and (3) the September 2009 medical bill and the March 2010 request for reconsideration were timely filed, we conclude that the Provider did not forfeit its right to reimbursement for failure "to timely submit a claim for payment," regardless of whether the September 2009 medical bill was "complete." *See* Tex. Lab. Code § 408.027(a).[8] Accordingly, we overrule the Carrier's second issue.

---

[7] In its appellate reply brief, the Carrier notes, "The [Provider] responds that upon receipt of the original bill, the Carrier did not follow the rules regarding the proper response to an incomplete bill. That is true."

[8] Moreover, as we have previously noted, Section 408.027(a) "applies to 'claim[s] for payment'" while the rules "apply to 'medical bill[s].'" *Facility Ins. Co. v. Vista Hosp. of Dall.*, No. 03-18-00663-CV, 2019 WL 6603168, at *6 (Tex. App.—Austin Dec. 5, 2019, pet. denied) (mem. op.). The Carrier does not discuss the distinction between the terms "claim" and "medical bill" such that the former would require a "complete medical bill" to constitute a "claim."

**Corrected Bill**

In its third issue, the Carrier argues that "[a]s defined by Medicare and [the Division] rules and [Division] authority interpreting those rules, the 'Corrected' bill was a new bill." Thus, the Carrier argues, because the Provider submitted a "Corrected Bill" on April 19, 2010—a bill denied by the Carrier as untimely—"[a]ny fee dispute had to be directed to the 'Corrected' bill." Moreover, the Carrier argues, because the "Corrected Bill" is a new bill, "[t]he [Provider] was not entitled to [MFDR] in the absence of a Request for Reconsideration," and it is undisputed that the [Provider] did not request reconsideration of the Carrier's denial of the "Corrected Bill."

However, as we have noted above, the Carrier took "final action" on both the September 2009 medical bill and the March 2010 request for reconsideration, and under the Division rules the Provider is entitled to request MFDR if dissatisfied with the Carrier's "final action" on a medical bill and request for reconsideration. *See* 28 Tex. Admin. Code §§ 133.240(h), (i), .250(h), .337(b)(1). The Carrier argues that "there is no statute, rule or mechanism allowing the ALJ to resurrect the original bill and wish away the new corrected one." The Provider responds that the "rules do not state that an untimely claim extinguishes a prior, timely-filed claim."

Although the Carrier may be correct that the "Corrected Bill" is a "new bill," the Carrier does not cite authority for the proposition that a provider's untimely corrected bill filed after a carrier has taken "final action" on an original bill and request for reconsideration prevents a provider from seeking MFDR of the original bill.[9] *See Maverick County*, 642 S.W.3d at 547

---

[9] Rule 133.20 states that providers "shall not resubmit medical bills to insurance carriers after the insurance carrier has taken final action on a complete medical bill and provided an

14

(noting that agency finding and conclusions "are presumed to be supported by substantial evidence, and the burden is on the contestant to prove otherwise" (quoting *Charter Med.–Dall.* 665 S.W.2d at 453)).  Thus, even though the Provider would likely not be entitled to MFDR of the Carrier's denial of the "Corrected Bill" as there was no request for reconsideration of that bill, the Carrier has not met its appellate burden to demonstrate that the Provider was not entitled to MFDR of the Carrier's denial of the original bill and request for reconsideration.[10]  We overrule the Carrier's third appellate issue.

---

explanation of benefits except in accordance with § 133.250" but "may correct and resubmit as a new bill an incomplete bill that has been returned by the insurance carrier." *See* 28 Tex. Admin. Code § 133.20(f), (g) (Medical Bill Submission by Health Care Provider).  The Carrier cites this rule to support its denial of the "Corrected Bill" but does not explain how it obviates the Provider's right to MFDR of the Carrier's final action on the original bill and request for reconsideration.

In its briefing on remand, the Carrier argues that "[b]y rule, the corrected bill [Bill Type 137] not only withdrew and replaced the original bill, its submission constitutes an admission and declaration that the original bill was not a 'complete' bill [and] that the corrected bill constituted a 'new' bill (restarting all the regulatory deadlines)."  The Carrier does not explain how "[b]y rule" the untimely corrected bill withdrew the original bill.  At the SOAH hearing, Bladuell testified that "bill type 137" can be "interpreted as the replacement bill for the original submission," and with its closing argument before SOAH, the Carrier submitted an excerpt from "UB-04/CMS-1450 Reference Material" of a chart "Type of Bill Codes" that notes code 137 is "Hospital" "Outpatient" "Replacement of Prior Claim."  However, the cover letter also described the "Corrected Bill" as a "2nd level of Reconsideration" and on the bill was handwritten "2nd Level of Appeal."  Given the substantial evidence standard of review, we conclude that there was a reasonable basis for the ALJ to conclude that the original bill was not withdrawn such that MFDR of the original bill following the Carrier's "final action" would be improper.

[10]  The Carrier also relies on the excerpts from the Decision Manual and its cited decisions.  However, in those decisions, the parties seeking MFDR sought to rely on their corrected bills, not the original bills, to establish their entitlement to reimbursement.  Here, on the other hand, as the Provider notes, "The [Division] did not consider [the Provider's] corrected claim, nor did the ALJ."

**AETNA Contract**

The Carrier's first issue states: "Did the ALJ have the legal and factual grounds to (impliedly) avoid the Aetna-Patients Medical Center network fee arrangement that both Hospital and Carrier acknowledged and invoked in the billing, payment and dispute resolution process?" For the relevant time here, the Texas Labor Code permitted providers and carriers to contract for terms and medical fee schedules in what were called informal or voluntary networks. *See* Tex. Lab. Code § 413.011(d-1)–(d-6). The Carrier asserts that the Aetna Contract provides for an "agreed rate of reimbursement" of "92% of the 'Allowable' as defined in the contract."

The Division rules, however, provide that "[t]he insurance carrier is not entitled to pay a health care provider at a contracted fee negotiated by an informal network or voluntary network if: (1) the notice to the health care provider does not meet the requirements of Labor Code § 413.011 and this section." 28 Tex. Admin. Code § 133.4(g) (Written Notification to Health Care Providers of Contractual Agreements for Informal and Voluntary Networks). Rule 133.4 requires that "[e]ach informal network or voluntary network, or the insurance carrier, or the insurance carrier's authorized agent, as appropriate, shall notify each affected health care provider of any person that is given access to the informal or voluntary network's fee arrangement with that health care provider within the time and manner provided by this section." *Id.* § 133.4(c). The notice "may be provided through a website link," but "only if the website: (A) contains the information stated in paragraphs (1), (2)(A) and (2)(B) of this subsection; and (B) is updated at least monthly with current and correct information." *Id.* § 133.4(d)(4). Paragraph (2) requires that the body of the notice must include: (A) "name, physical address, and telephone number of any person that is given access to the informal or voluntary network's fee arrangement"; and (B) "the start date and any end date during which any person has been

16

given access to the health care provider's contracted fee arrangement." *Id.* § 133.4(d)(2). Rule 133.4 also requires that "[t]he informal or voluntary network, insurance carrier, or the insurance carrier's authorized agent, as appropriate, shall document the information provided in the notice as required by subsection (d) of this section, the method of delivery, to whom the notice was delivered, and the date of delivery." *Id.* § 133.4(e). Finally, Rule 133.4 provides that "[f]ailure to provide documentation upon the request of the Division or failure to provide notice that complies with the requirements of Labor Code § 413.011 and this section creates a rebuttable presumption . . . in a medical fee dispute that the health care provider did not receive the notification." *Id.*

In addition to requesting a copy of the Aetna Contract, the Division requested from the Carrier "Documentation to support that [the Provider] was notified in accordance with 28 Tex. Admin. Code § 133.4." However, the appellate record does not include documentation showing "the information provided in the notice as required by subsection (d) of this section, the method of delivery, to whom the notice was delivered, and the date of delivery." *See id.* § 133.4(e). Instead, the cover letter responding to the request merely states, "In response to the [Division]'s inquiry regarding compliance with 28 Tex. Admin. Code 133.4, [the Provider] has been made aware of their participation status with AWCA since April 15, 2008." Accordingly, the MFDR officer found that "[r]eview of the submitted information finds that the documentation does not support notification to the healthcare provider in the time and manner required" and concluded that "pursuant to § 133.4(g), the insurance carrier is not entitled to pay the health care provider at a contracted fee." And in the SOAH Order, the ALJ concluded that the "Carrier failed to carry its burden that [the Provider] is not entitled to $20.495.78 in additional reimbursement."

Because the Texas Supreme Court has determined that the Carrier had the burden of proof in the contested case hearing before SOAH, *see Patients Med. Ctr.*, 623 S.W.3d at 343, our inquiry on this issue under the substantial evidence rule is whether "some reasonable basis exists in the record," *see Maverick County*, 642 S.W.3d at 544 (quoting *Charter Med.–Dall.*, 665 S.W.2d at 452), for the ALJ to impliedly conclude that the Carrier did not meet its burden to demonstrate that any alleged notice provided to the Provider satisfied Rule 133.4 such that the Aetna Contract applied.[11]

The Carrier argues that the rules "only required the contract be supplied to the [Division], and that Aetna provide documentation of the website where the [Provider] could have reviewed to determine if this Carrier had access to the network contract," and asserts that "Aetna documented the time and manner of its notice relevant to this [Provider] and this outpatient encounter." But this assertion does not accurately convey what the rules require. Although the record includes the Aetna Contract, which includes a website link,[12] the record does not

---

[11] The Carrier argues that the Provider "offered no evidence the contract did not apply or that payer access information had not been available to it." But as determined by the Texas Supreme Court, the Carrier, not the Provider, had the burden of proof in the contested case hearing. *See Patients Med. Ctr. v. Facility Ins. Corp.*, 623 S.W.3d 336, 343 (Tex. 2021). In arguing that the ALJ erred in placing the burden of proof on the Carrier, the Carrier appears to concede that the Provider did not need to offer proof if the Carrier bore the burden: "The ALJ's presumptive adoption of everything the [MFDR officer] found, and the reversal of the burden of proof to the Carrier to disprove every finding and conclusion of the [MFDR officer], relieved the [Provider] of doing or saying anything related to this avoidance of its contract—a claim that it had never made. The [Provider] was relieved of even having to claim at the [contested case hearing] it did not have the required notice, even though all its actions and words said otherwise."

[12] The Aetna Contract states, "Authorized Agent; Contractual Fee Arrangement. Participating Provider understands and agrees that Company is the authorized agent for a number of workers' compensation carriers, including The Hartford (and its affiliates, including Specialty Risk Services), Amerisure, Utica National Insurance Company (and any other carriers listed at http://awca.aetna.com), for the purposes of developing a network of workers' compensation

18

demonstrate that the Carrier was listed on the website link as having been given access to the network's fee arrangement. *See* 28 Tex. Admin. Code § 133.4(d)(2), (4) (providing that notice may be provided through website link but "only if" website contains "name, physical address, and telephone number of any person that is given access to the informal or voluntary network's fee arrangement" and "the start date and any end date during which any person has been given access"). Given the Carrier's failure to provide documentation that it was required to keep in response to the Division's request as required under Rule 133.4, the presumption is that the Provider did not receive notice that met the requirements of Rule 133.4. *See id.* § 133.4(e).

The Carrier asserts that even if it failed to provide the necessary documentation, "that would only have created a rebuttable presumption the [Provider] did not receive notification of the time and manner of that information." The Carrier argues, "The Carrier's witness testified the Carrier had access to and had applied the Aetna contract, and that the [Provider] was clearly aware of it." But even if the Provider was "aware" of the Aetna Contract, the Carrier is only entitled to the contracted fee if the notice to the Provider satisfied Rule 133.4. *See id.* § 133.4(g). And the Carrier does not identify any evidence that the provided notice—i.e., the website link in the Aetna Contract—satisfied the requirement of containing the "name, physical address, and telephone number of any person that is given access to the informal or voluntary network's fee arrangement with a health care provider." *See id*. § 133.4(d)(2), (4).[13] Accordingly, we overrule the Carrier's first appellate issue.

---

providers and negotiating fee arrangements with such providers on the carrier's behalf. The contractual fee arrangement is between the Participating Provider and AWCA."

[13] The Carrier also argues, "The [Provider] had not disputed application of the Aetna network contract, and in any event, waived any such claim." But the MFDR concerned the Carrier's denial of the Provider's billing statement that did not apply the contractual rate, and

**Reimbursement Calculation**

In the Carrier's final appellate issue, it challenges the MFDR officer's reimbursement calculations and the ALJ's conclusion that the Carrier did not meet its burden in the contested case hearing before SOAH to show that the Provider is not entitled to the reimbursement amount. The Carrier argues that "[w]hile there are numerous errors [in the reimbursement calculations], the fundamental and most egregious error is the failure to exclude from the outlier calculations all the charges for implants and other items that were associated with surgical services for which the Carrier is not liable" and that "the Carrier has no liability for items ancillary to services that were not preauthorized." As we noted in our initial decision:

> As outlined in great detail in Carrier's brief, a critical component of the formula used in the [MFDR officer]'s calculation of the reimbursement amount is the so-called "sum of all packaged costs," which the [MFDR officer]—without any explanation—declared to be $20,649.75. This "packaged costs" amount was determinative in the [MFDR officer's] conclusion that Provider was entitled to so-called "outlier payments," which comprised the largest component of the total reimbursement awarded.

*Facility Ins.*, 574 S.W.3d at 444 n.8. Among other challenged calculation concerns, the Carrier specifically argues, "The ALJ erred by including the charges and costs for a spinal cord stimulator/generator (C1820) in any calculations, including outlier calculations."

before SOAH, the Provider argued: "The evidence presented does not support that the required notification of the contracted fee arrangement claimed by the carrier was timely and appropriately provided to the healthcare provider as required by 28 Texas Administrative Code § 133.4. Therefore, pursuant to § 133.4(g), the insurance carrier is not entitled to pay the health care provider at a contracted fee." At the SOAH hearing, the Carrier's counsel asked the Provider's chief financial officer Hanson, "[D]o you have any reason to believe that contract— the Aetna contract in evidence didn't apply," to which Hanson responded, "No." But on cross examination, the Provider's counsel asked, "Do you have any reason to believe the contract did apply? Do you know whether the contract applied one way or the other?" Hanson responded, "No. Because, again, I wasn't here when they registered the patient, so I don't know what the circumstance was." Hanson also testified that he was not aware of any notification from the Carrier that "it was a participant in the contract."

In its original bill, the Provider billed the Carrier, as relevant for this issue, the following four charges, among other charges:

- "generator neuro rechg ba," code C1820, for $47,250,[14]

- "revise/remove neurorecei," code 63688, for $2,558.75,

- "revise/remove neuroelect," code 63660, for $2,558.75, and

- "analyze neurostim, compl," code 95972, for $2,558.75.

(Capitalization removed.) During the SOAH proceedings, the Carrier submitted excerpts from the American Medical Association's Current Procedural Terminology (2004) (AMA's CPT), which described some of these CPT Codes. AMA's CPT explains that "Codes 63650-63688 apply to both simple and complex neurostimulators"; that "[f]or insertion of neurostimulator pulse generator, see 61885, 63685, 63688, 64590," "[f]or revision or removal of neurostimulator pulse generator or receiver, see 61888, 63688, 64595," and "[f]or initial or subsequent electronic analysis and programming of neurostimulator pulse generators, see codes 95970-95975"; and that "Codes 95972 and 95973 describe intraoperative (at initial insertion/revision) or subsequent electronic analysis of an implanted complex brain, spinal cord or peripheral (except cranial nerve) neurostimulator pulse generator system, with programming." AMA's CPT defines code 63660 as "Revision or removal of spinal neurostimulator electrode percutaneous array(s) or plate/paddle(s)"; code 63688 as "Revision or removal of implanted spinal neurostimulator pulse generator or receiver"; and code 95972 as "complex brain, spinal cord or peripheral (except cranial nerve) neurostimulator pulse generator/transmitter, with intraoperative or subsequent programming, first hour." The excerpts from the AMA's CPT did not include a definition of

---

[14] In its corrected bill, however, the Provider dropped this charge.

21

code C1820, but Bladuell testified at the SOAH hearing that C1820 is "a charge for an implant, which would have been the generator."

In determining what rule to apply to calculate the reimbursement amount due, the MFDR officer found:

> This dispute relates to facility services performed in an outpatient hospital setting with reimbursement subject to the provisions of 28 Texas Administrative Code § 134.403, which requires that the reimbursement calculation used for establishing the maximum allowable reimbursement (MAR) shall be the Medicare facility specific amount, including outlier payment amounts, determined by applying the most recently adopted and effective Medicare Outpatient Prospective Payment System (OPPS) reimbursement formula and factors as published annually in the Federal Register with the application of minimal modifications as set forth in the rule. Per § 134.403(f)(1), the sum of the Medicare Facility specific reimbursement amount and any applicable outlier payment amount shall be multiplied by 200 percent, unless a facility or surgical implant provider requests separate reimbursement of implantables. Review of the submitted documentation finds that separate reimbursement for implantables was not requested.
>
> . . . .
>
> Under the [OPPS], each billed service is assigned an Ambulatory Payment Classification (APC) based on the procedure code used, the supporting documentation and the other services that appear on the bill. A payment rate is established for each APC. . . . Payment for ancillary and supportive items and services, including services that are billed without procedure codes, is packaged into payment for the primary service.

*See* 28 Tex. Admin. Code § 134.403 (Hospital Facility Fee Guideline—Outpatient). The Provider did not challenge the finding that "separate reimbursement for implantables was not requested," and the Carrier does not challenge the application of Rule 134.403, assuming that the contractual fee arrangement does not apply, which we have concluded above that it does not. The MFDR officer also found that the denial reason for code 63688 "is supported" and denied

reimbursement for that coded billing item, which the Provider has not challenged.[15] As to code C1820, however, the MFDR officer concluded that "[p]er Medicare policy, payment for the surgical implantable supply item is included in the reimbursement for surgical services that had been preauthorized by the insurance carrier"; that "[r]eview of the submitted information finds no documentation to support [the Carrier's] denial reason"; and that "code C1820 will therefore be reviewed per applicable Division rules and fee guidelines," presumably by being packaged into payment for the primary services.

The Carrier argues, however, that "[t]here is no preauthorized or billed surgical procedure to which C1820 could attach" because the two primary surgical services relied on by the MFDR officer—codes 63660 and 95972—"did not require a new generator."[16] Although "removal of the already implanted generator (CPT 63688) was billed," the Carrier argues that it cannot be a surgical procedure to which C1820 could attach because it was "found not to be preauthorized by the [MFDR officer]—a finding unchallenged by the [Provider]." And the Carrier notes that "implantation of a new generator (CPT 63685) was not preauthorized or billed."

Other than to state that this "surgical implantable supply item" was "included in the reimbursement for surgical services that had been preauthorized by the insurance carrier," the

---

[15] As to code 63688, the MFDR officer's finding states, "the carrier is liable for all reasonable and necessary medical costs relating to the health care listed in subsection (p) only in the case of an emergency of 'preauthorization of any health care listed in subsection (p) . . . that was approved prior to providing the health care.' §134.600(p)(2) states that the non-emergency health care requiring preauthorization includes 'outpatient surgical or ambulatory surgical services.' No documentation was found to support a medical emergency, nor was any documentation found to support that this surgical service had been preauthorized."

[16] The MFDR officer calculated a reimbursement amount for one other primary service, code 62273, which AMA's CPT describes as "Injection, epidural, of blood or clot patch." Because this code is not relevant to the billing of code C1820, we do not discuss it here.

23

MFDR officer does not explain to which preauthorized surgical service the C1820 implant applied. At the SOAH hearing, the following exchange occurred between the Carrier's counsel and Bladuell:

Q       Okay. Now, I'd refer you to finding and decision, section 4—or finding number 4 in the [MFDR officer's] findings and decision. And it refers to CPT C-1820. Do you know what that is?

A       That's a—I think that's a charge for an implant, which would have been the generator.

Q       And what was the charge for that generator?

A       It appears to be $47,250.

Q       Okay. And the—in respect to an implantable such as that generator, do the rules specifically require the provider to ask for preauthorization to purchase the generator?

A       If it's an implant for surgery that indicates that's going to be implanted into the patient, it would not require preauth, because once we preauthorize the service, which would require an implant, the implant falls within that.

Q       Okay. So in order for someone to be entitled to reimbursement for the implant—in this case, the generator—they had to have requested and received preauthorization for the procedure that required the implantation?

A       That is correct.

Q       In this case, did the hospital—or did the doctor ever request preauthorization for the CPT code related to the implantation of a new generator?

A       They did not.

Q       And if they didn't ask for a preauthorization, I assume it was never given; is that correct?

A       That's correct.

Q       Did the hospital bill for the procedure "insertion of a new generator"? And for the record, that would be CPT code 63685, based on—

A      They didn't.  They did not.

Q      And so your—your testimony is they did not request preauthorization for, or bill for, the procedure where they were implanting the generator?

A      That is correct.


The exchange continued:


Q      . . . And you agree that there was no specific award of the C-1820, correct?

A      Correct

Q      But did the Division, in their calculations for outlier payments, include the charges for and cost of the neurostimulator?

A      That's what it appears that they're stating on their decision.

Q      Okay.  So it certainly had an effect on the outlier payments.  It increased them substantially; did it not?

A      Yes.


As noted by Bladuell, the MFDR officer appears to have included the $47,250 in calculating the

outlier payment when the MFDR officer concluded that "[t]he sum of all packaged costs is

$20,649.75," although it is unclear exactly how she calculated this number.  In its written closing

argument before SOAH, the Carrier explained:

> Based upon the Cost-to-Charge Ratio (CCR) used in the Decision (0.2379) and reversing that calculation, the [MFDR officer] would have started with total packaged charges of $86,800.13 [i.e., $20,649.75 ÷ 0.2379].  This total is only $7,840.35 shy of the total charges of $94,640.48.  The $7,740.35 the [MFDR officer] carved out corresponds to the sum of the charges for three surgical services on the bill, ($2,558.75 x 3) + $164.00 = $7,840.25.  . . .  Improperly using the original bill which had been replaced, the [MFDR officer] carved out the billing for 63660, 95972 and 62273.  The $164.00 comes from HCPCS code J2405 for a separately payable Ondansetron injection.  CPT 63688 was also on

25

that bill, but the [MFDR officer] did recognize it as a non-covered charge. It had been determined not to be preauthorized. These calculations are $0.10 off the [MFDR officer]'s. Note that during testimony Mr. Bladuell had not determined exactly how the [MFDR officer] had come to her $20,649.75 number. The above mathematical explanation is as close as we can come.

Thus, according to this explanation, the $47,250 would have been utilized in calculating the total packaged charges of $86,800.13 before applying the CCR. The Provider did not present evidence or provide an alternative explanation of how the $20,649.75 amount for the "sum of all packaged costs" was derived without utilizing the $47,250 amount that was billed for C1820. Nevertheless, the ALJ concluded that the "Carrier failed to carry its burden that Provider is not entitled to $20,495.78 in additional reimbursement."

Based upon the Carrier's evidence and argument, we conclude that the Carrier met its appellate burden to demonstrate that substantial evidence did not support the ALJ's conclusion that the Carrier failed to carry its burden regarding the calculation of the amount of additional reimbursement due. *See* Tex. Gov't Code § 2001.174(2). Accordingly, we sustain the Carrier's fourth issue.

The Carrier also challenged the calculated reimbursement amount based on other specified coded billing items, including for codes 95972, 62273, C1778, and C1883. But because we do not have the power to render the decision that the ALJ should have rendered in the SOAH Order, *see id.*; *Freightliner Corp.*, 255 S.W.3d at 367 ("Although courts are empowered to affirm, reverse, or remand agency decisions, we do not find a power in this type of situation to render a decision that the agency should have rendered."), we need not address the Carrier's other challenges to the reimbursement calculations within this issue to reverse and remand the case for further proceedings. Our remand is limited to the Carrier's fourth issue on

appeal, and we leave it to the agency to decide how to conduct its review of the remanded issue. *See Freightliner Corp.*, 255 S.W.3d at 362 ("Although courts may not be authorized to dictate *how* an agency conducts its review of remanded issues or decides them, the express power to affirm in part necessarily means that courts have some control over *what issues* the agency can reconsider on remand subject to the limitations of judicial authority over agencies.").

## CONCLUSION

For these reasons, we (1) reverse the SOAH Order in part insofar as it concludes that "Carrier failed to carry its burden that Provider is not entitled to $20,495.78 in additional reimbursement" and orders reimbursement in that amount, (2) affirm the SOAH Order in all other respects, and (3) remand the case to the Division for further proceedings consistent with this opinion. *See* Tex. Gov't Code § 2001.174(2).

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Triana, and Kelly

Affirmed in Part; Reversed and Remanded in Part on Remand

Filed: September 8, 2022